**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**AMY SHIRLEY OLIVER, as Personal**
**Representative of the Estate of Anthony**
**Carl Oliver, Sr., deceased, for and on behalf**
**of the survivors of the Estate of Anthony**
**Carl Oliver, Sr.,**

           **Plaintiff,**

**-vs-**                                                     **Case No. 6:06-cv-1671-Orl-31DAB**

**CITY OF ORLANDO, LORI FIORINO,**
**Orlando Police Department Officer; DAVID**
**BURK, Orlando Police Department Officer;**
**TASER INTERNATIONAL, INC.,**

           **Defendants.**

## ORDER

This case arises out of the events surrounding the death of Anthony Carl Oliver, Sr. ("Oliver"). Plaintiff Amy Oliver brings this action, on behalf of Oliver's estate and his survivors, against Taser International, Inc., the City of Orlando (the "City") and Officers Lori Fiorino and David Burk ("the Officers"). This matter is before the Court on Motions for Summary Judgment based on claims of qualified immunity filed by the Officers (Docs. 140 and 141) and Plaintiff's Responses thereto (Docs. 196 and 197).

**I. Background**[1]

---

[1] The testimony of the Officers differs significantly with regard to many aspects of this incident. However, at this stage the Court is obliged to construe the facts in the light most favorable to the Plaintiff. *See Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006)

On May 13, 2004 at approximately 3:17 p.m., Officer Lori Fiorino ("Fiorino") of the Orlando Police Department ("OPD") noticed a man standing in the median on West Colonial Drive near Tampa Avenue, waving his arms and attempting to flag her down. Fiorino Deposition ("FD") at 100, 128. Fiorino turned her car around and parked in the eastbound turning lane. FD at 101, 104. Once she came to a stop, Oliver approached her vehicle and was knocking on the windows and attempting to open the doors. FD at 101. Fiorino used her loud speaker to instruct Oliver to move to the front of her vehicle, which he did. FD at 102-03. Fiorino then exited her vehicle, pulled out her Taser and attempted to communicate with Oliver to find out what the problem was. FD at 105, 108. Oliver responded to Fiorino's inquiries by saying "They're shooting at me" several times, and pointing across the street. FD at 105, 106. Fiorino told Oliver to calm down and tell her what was going on. FD at 106. Oliver then began to walk very quickly toward Fiorino. FD at 108. In response, Fiorino raised her Taser and told Oliver to step away from her and Oliver complied. FD at 109. Fiorino states that throughout this encounter Oliver was "very fidgety." FD at 109.[2]

Fiorino continued to ask Oliver for details about who was shooting at him and what was going on. FD at 110. She also called dispatch to find out if there had been any shootings reported in the area. FD at 110. Fiorino was told that there had been a shooting reported eight or nine miles away, but nothing in her area. FD at 110-11. At this point, Fiorino requested that back-up be sent to her location.

---

[2] While talking to Oliver, Fiorino noticed that Oliver had a white substance in his mouth, which he told her was aspirin. FD at 112.

Seconds after Fiorino had requested back-up, Officer David Burk ("Burk") arrived on the scene. FD at 112. Burk parked his car so that it, along with Fiorino's car, was boxing in the turning lane where the incident was taking place. Burk Deposition ("BD") at 78. When Burk arrived, Oliver was standing several feet from Fiorino in the median, talking loudly and "moving his hands around." BD at 75.

After Fiorino told Burk what was going on, they considered taking Oliver into custody under Florida's Mental Health Act, Fla. Stat. § 394-463(1) ("the Baker Act"), because he appeared to be mentally unstable. Burk then approached Oliver and asked him for his name and identification. FD at 115, 136; BD at 79. Oliver complied by giving Burk his identification card. FD at 116, 136; BD at 79. Burk then waited for the light at the nearby intersection to turn red and tried to coax Oliver across the street to the sidewalk so that they could talk. FD at 138; BD at 81. Burk put his hand on Oliver's shoulder to guide him across the street, but Oliver stopped in the middle of the street and began to babble incoherently. BD at 83; FD at 138-39. When the light changed and traffic began to move again, Burk tried to force Oliver across the street but Oliver became agitated and pulled away from him. BD at 86; FD at 139.

Burk grabbed Oliver's shirt to try to get him out of the road, but Oliver resisted. BD at 87-88; FD at 139-40. Oliver was flailing his arms and trying to push Burk off of him, but Burk kept holding on to his shirt. FD at 140-41. Approximately 30 seconds after Burk arrived on the scene, Fiorino says she saw Oliver try to push Burk away so she fired her Taser at Oliver for the first

time.³ FD at 129-30, 132-33, 141. The taser prongs hit Oliver in his abdomen and he fell to the ground. Fiorino then called in to report the use of force to her sergeant. FD at 132-33.

Fiorino stated that she continued to tase Oliver because he would not stay on the ground.⁴ After the third or fourth tase, one of the taser wires became disconnected from the taser prong. FD at 150, 192; BD at 97, 190. Fiorino then loaded a second cartridge into her taser and began tasing Oliver again. FD at 150. Fiorino said she was not sure how many times she tased Oliver⁵, but that she just kept pulling the trigger until he stayed on the ground. FD at 155. Fiorino stated that the last time she tased Oliver, he was lying on his back in the middle of the road. FD at 159-60.

Carl Hughley and Richandra Nelson, who witnessed the incident, stated that after the first tase Oliver was on the ground and never got back up. (Doc. 193-8, 193-2 at 1).⁶ Hughley stated that Oliver was lying on the ground screaming that it was "too hot" and trying to get up, but was not able to. (Doc. 193-8 at 5). Nelson stated that Oliver remained on the ground until the other Officers arrived, while Burk just stood there and watched Fiorino tase him. (Doc. 193-2 at 2). Both Nelson and Hughley witnessed Oliver attempting to get up from the ground, but said that they never saw him struggling with Burk. (Doc. 193-2 at 6). Nelson stated that she did not see Burk try

---

³It seems virtually impossible for all of these events to have occurred within thirty seconds of Burk's arrival.

⁴Neither Fiorino nor Burk testified that they ever told Oliver to stay on the ground.

⁵The Taser Log shows that Fiorino fired eight times over a period of two minutes and nine seconds. (Doc. 143-13 at 6). However, on the day of the incident Fiorino believed she had fired eleven or twelve times. FD at 166.

⁶Plaintiff's exhibit filed at Doc. 193-2 was stricken from the public view because it contained personal information about a witness. Plaintiff has been give leave to re-file a redacted version of this exhibit, however, for purposes of this Order the Court will cite to the original document number.

to handcuff Oliver until after the other officers arrived at approximately 3:24 p.m. (Doc. 193-2 at 2, 5, 6); FD at 131.[7]

Fiorino stated that after Oliver was handcuffed, foam was coming out of his mouth and that it looked like Oliver's body was going limp, but he was still screaming. FD at 174, 187-88. After Burk walked Oliver back to the median, Fiorino took some of the taser prongs out of his body but was unable to remove them all. BD at 108; FD at 182.

At 3:35 p.m. EMT Carly Bishop ("Bishop") and her partner, paramedic Rudy Smith ("Smith") arrived on the scene. Oliver was handcuffed and sitting on the median, awake but not talking. Carly Bishop Deposition ("CBD") at 10, 36, 43.  After Oliver was placed on the stretcher, Burk noticed that Oliver had blood in his mouth. BD at 121. As Oliver was being put in the ambulance, he sat straight up, looked at Bishop and began to have a seizure. CBD at 14. After Oliver was put in the ambulance his health began to deteriorate rapidly and his temperature was 107 degrees. BD at 144; CBD at 39. Oliver was pronounced dead on June 1, 2004 at Florida Hospital. (Doc. 30 at 5).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the

---

[7]When the other officers arrived at the scene, Burk told Oliver to roll over on his belly and then proceeded to handcuff him. FD at 158-60. Burk then rolled Oliver onto his side, searched his pockets, and tried to sit him up, but Oliver kept trying to lie back down. FD at 173.

burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis,* 451 F.3d at 763 (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

**III. Legal Analysis**

Plaintiff alleges that Burk and Fiorino are liable under 42 U.S.C. § 1983 ("§ 1983") for using excessive force against Oliver, in violation of the Fourth Amendment.[8] The Officers argue that they are entitled to qualified immunity.

In order to receive qualified immunity, "the government official must first prove that he was acting within [the scope of] his discretionary authority." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). Once a defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id*. To determine whether qualified immunity is appropriate, the Court must ask two questions. First, whether, viewed in the light most favorable to the plaintiff, the evidence shows the officers violated his constitutional rights. *Id.* Second, if such violation occurred, the Court must determine whether that right was clearly established. *Id.* It is undisputed that the Officers were acting within the scope of their discretionary authority, thus the Court turns to the question of whether Oliver's constitutional rights were violated.

*A) Was there a constitutional violation?*

The Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force during a criminal apprehension. *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In determining whether the officers' force was reasonable, we must determine "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Ferraro*, 284 F.3d at 1197 (citation omitted). Under *Graham*, courts should determine the "objective

---

[8]An officer may be held liable under § 1983 even if his involvement was purely passive because police officers have "a duty to intervene when another officer uses excessive force." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). Burk argues that he had no opportunity to intervene because Fiorino's tases came in rapid succession. (Doc. 140 at 19). This argument is clearly not supported by the facts.

> reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "governmental interest at stake." 490 U.S. at 396.

*Mercado v. City of Orlando,* 407 F.3d 1152, 1156-57 (11th Cir. 2005).

> When determining the government's interest, we must consider factors that include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Furthermore, the reasonableness of a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*
>
> Because this situation does not involve a criminal arrest, our facts do not fit neatly within the *Graham* framework. . . .
>
> [Thus, the Court must] consider the extent to which [Oliver] placed himself or others in danger. *See Kesinger v. Herrington*, 381 F.3d 1243, 1249-50 (11th Cir. 2004) (granting qualified immunity to officer who used deadly force on a suicidal victim who "posed an immediate threat of harm" to himself, the officer, and others).

*Mercado,* 407 F.3d at 1157.

Here, the Officers had no concern for their own safety or the safety of others. Oliver made no threats to harm the Officers or anyone else. He was not belligerent, nor were his actions threatening in nature. Except for crossing the street, he fully complied with the Officers' instructions. Indeed, the "arrest" was motivated by a belief that Oliver was mentally incompetent and should be held under the Baker Act[9] for his own protection.

---

[9]The relevant portions of the Baker Act provide that:

A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness:

(a) . . . . 2. The person is unable to determine for himself or herself whether examination is necessary; and

(b) . . . . 2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent

However, when Oliver resisted Burk's efforts to escort him across the street, he created a danger to himself and others. Given Oliver's unusual conduct, it was not, therefore, unreasonable for Fiorino to employ her taser, without warning, in order to subdue Oliver and gain control of him. *See, e.g., Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004). But, was it reasonable for Fiorino to continue to tase Oliver multiple times while he was on the ground?[10]

The Officers claim that Fiorino continued to tase Oliver because he kept standing back up. But there is no evidence that he was ordered to stay on the ground. Indeed, the purpose of the encounter was to get him out of the street. Moreover, witnesses at the scene testified that Oliver never got back up after the first tase.

After tasing Oliver the first time, the Officers apparently made no effort to restrain him by use of conventional means.[11] Indeed, Fiorino admits that the last time she tased Oliver, he was lying on his back in the middle of the road. Thus, it appears that Fiorino used her taser

---

behavior.

Fla. Stat. § 394.463(1).

[10] Fiorino was using a Taser M26 Electronic Control Device, which was "designed to cause significant, uncontrollable muscle contractions capable of incapacitating even the most focused and aggressive combatants." (Doc. 143-8 at 28). "The taser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the taser gun by high-voltage insulated wire. When the probes make contact with the target, the taser gun transmits electrical pulses along the wires and into the body of the target, through up to two inches of clothing." *Draper*, 369 F.3d at 1273 n3. The pulses are five seconds in duration, unless the trigger is held down longer than five-seconds. (*See* Doc. 142-42 at 70). "Each 5-second cycle is a 'window of opportunity' for the arrest team to apprehend the subject and go hands on." *Id.* at 73.

[11] The Officers made no attempt to handcuff Oliver until additional police officers arrived on the scene. At that time, Oliver complied with Burk's order to roll over onto his belly so he could be handcuffed.

unreasonably under the circumstances. Instead of temporarily incapacitating Oliver, Fiorino repeatedly tased him into complete physical capitulation, which allegedly led to his death. This level of force was excessive, disproportionate and a violation of Oliver's rights under the Fourth Amendment.

### B) Was the right clearly established?

> "For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Bates v. Harvey*, 518 F.3d 1233, 2008 WL 565774, *13 (11th Cir. 2008) (internal quotation marks and citation omitted). "A plaintiff need not show that the officer's conduct specifically has been held unlawful. Rather, to avoid having [his] suit barred by qualified immunity, a plaintiff need only show that in the light of pre-existing law the unlawfulness [was] apparent." *Id*. "Thus, the salient question . . . is whether the state of the law at the time the officer[] acted gave [him] fair warning that [his] conduct was unconstitutional." *Id*. (citation omitted). . . .
>
> The law provides an officer "fair and clear notice" that his conduct is unconstitutional in three ways. First, the case may be one of "obvious clarity" – the officer's conduct will "lie[] so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law" on point. *Vinyard*, 311 F.3d at 1350 (citations omitted). Second, "where the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face," the court turns to case law to look for a broad statement of principle that a particular type of conduct was unconstitutional (without linking that conduct to a specific set of facts). *Id*. at 1351. And finally, in the absence of case law determining that a particular type of conduct was unconstitutional, the court looks at precedent that is tied to the facts. *Id*.

*McNally v. Eve*, 2008 U.S. Dist. LEXIS 36144, *26-28 (M.D. Fla. May 2, 2008).

While there is no case law directly on point, this Court finds that no reasonable police officer could have believed such behavior to be permissible under the constitution.

> Other courts in this circuit addressing whether the use of a taser was reasonably proportionate to the need for force in light of *Draper* have examined factors such as the severity of the crime, the immediate threat to the officer, the number of times the officer deployed the taser, the injury sustained by the arrestee, and whether the officer warned the arrestee of the potential use of the taser. Compare *Magee v. City of Daphne*, No. 05-0633-WS-M, 2006 U.S. Dist. LEXIS 93183, 2006 WL 3791971, **9-10 (S.D. Ala.

>   Dec. 20, 2006) (finding qualified immunity where the officers perceived the plaintiff (under arrest for the severe crime of domestic violence) to be argumentative, uncooperative, intoxicated, and having extremely aggravated demeanor; the plaintiff also showed no evidence of injury); *Ainsworth*, 2006 U.S. Dist. LEXIS 68003, 2006 WL 2709850 at **5-6 (finding qualified immunity where the officers used a taser only once (after issuing two warnings about using the taser) to subdue a violent, unstable, and threatening plaintiff; the officers had patiently tried using lesser force to compel plaintiff to comply but to no avail); *Dargan v. Hernandez-Vega*, No. 6:05-CV-121-ORL-18JGG, 2006 U.S. Dist. LEXIS 12723, 2006 WL 822558, *8 (M.D. Fla. Mar. 24, 2006) (finding qualified immunity because the officers' use of a taser was reasonable where the plaintiff, who did not respond to officers' demands after they threatened to use taser, was not arrested and secured; the one-time tasering, resulting in unsubstantiated injuries, was a marginal use of force under the circumstances); with *Stephens*, 509 F. Supp. 2d at 1112-13 (denying qualified immunity where the officers tasered an unarmed arrestee four times; the arrestee made no effort to escape and no movement that could be deemed an attack, and the officers used force only because the arrestee was being verbally unruly and refusing to don jail garb); *Buckley v. Haddock*, No. 5:06cv53-RS, 2007 U.S. Dist. LEXIS 15775, 2007 WL 710169, *1 (N.D. Fla. Mar. 6, 2007) (denying qualified immunity where the officer tasered the plaintiff for refusing to cooperate in his arrest for failing to sign a traffic citation; although the evidence revealed that one application of the taser may arguably have been appropriate, multiple applications of force were unnecessary and grossly disproportionate); *Maiorano v. Santiago*, No. 6:05-CV-107-ORL-19KRS, 2005 U.S. Dist. LEXIS 40879, 2005 WL 1200882, *8 (M.D. Fla. May 19, 2005) (denying qualified immunity where the officer tasered the plaintiff without advance warning or a verbal command to desist from engaging in a physical altercation with another student).

*McNally*, 2008 U.S. Dist. LEXIS 36144 at *35-36, n19.

Oliver had committed no crime and was considered a danger only to himself. Fiorino's taser was employed numerous times without warning and with no intervening attempt to use conventional means of physical restraint. Under these circumstances, any reasonable officer would have known that the amount of force used against Oliver was excessive and, therefore, unconstitutional.

   *C) Causation*

Finally, the Officers argue that Plaintiff cannot prove that their use of force on Oliver caused his death. However, Plaintiff has presented the testimony and report of an expert witness

who opines that Oliver's death was caused by the tasing. Thus, the issue of causation is a fact issue to be determined by a jury.

### IV. Conclusion

Officers Fiorino and Burk are not entitled to qualified immunity. Accordingly, it is

**ORDERED** that Defendants' Motions for Summary Judgment are **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 20, 2008.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party