**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

AMY SHIRLEY OLIVER, as Personal
Representative of the Estate of Anthony
Carl Oliver, Sr., deceased, for and on behalf
of the survivors of the Estate of Anthony
Carl Oliver, Sr.,

                Plaintiff,

-vs-                                      Case No. 6:06-cv-1671-Orl-31DAB

CITY OF ORLANDO, LORI FIORINO,
Orlando Police Department Officer; DAVID
BURK, Orlando Police Department Officer;
TASER INTERNATIONAL, INC.,
                Defendants.

## ORDER

This case arises out of the events surrounding the death of Anthony Carl Oliver, Sr. ("Oliver"). Plaintiff Amy Oliver brings this action, on behalf of Oliver's estate and his survivors, against Taser International, Inc., the City of Orlando (the "City") and Officers Lori Fiorino and David Burk ("the Officers"). This matter is before the Court on a Motion for Summary Judgment filed by the City (Doc. 139) and Plaintiff's Response thereto (Doc. 195).[1]

**I. Background[2]**

---

[1] The City moves for summary judgment on Counts II, III and IV of the Second Amended Complaint (Doc. 30).

[2] The testimony of the Officers differs significantly with regard to many aspects of this incident. However, at this stage the Court is obliged to construe the facts in the light most favorable to the Plaintiff. *See Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006)

On May 13, 2004 at approximately 3:17 p.m., Officer Lori Fiorino ("Fiorino") of the Orlando Police Department ("OPD") noticed a man standing in the median on West Colonial Drive near Tampa Avenue, waving his arms and attempting to flag her down. Fiorino Deposition ("FD") at 100, 128. Fiorino turned her car around and parked in the eastbound turning lane. FD at 101, 104. Once she came to a stop, Oliver approached her vehicle and was knocking on the windows and attempting to open the doors. FD at 101. Fiorino used her loud speaker to instruct Oliver to move to the front of her vehicle, which he did. FD at 102-03. Fiorino then exited her vehicle, pulled out her Taser and attempted to communicate with Oliver to find out what the problem was. FD at 105, 108. Oliver responded to Fiorino's inquiries by saying "They're shooting at me" several times, and pointing across the street. FD at 105, 106. Fiorino told Oliver to calm down and tell her what was going on. FD at 106. Oliver then began to walk very quickly toward Fiorino. FD at 108. In response, Fiorino raised her Taser and told Oliver to step away from her and Oliver complied. FD at 109. Fiorino states that throughout this encounter Oliver was "very fidgety." FD at 109.[3]

Fiorino continued to ask Oliver for details about who was shooting at him and what was going on. FD at 110. She also called dispatch to find out if there had been any shootings reported in the area. FD at 110. Fiorino was told that there had been a shooting reported eight or nine miles away, but nothing in her area. FD at 110-11. At this point, Fiorino requested that back-up be sent to her location.

---

[3] While talking to Oliver, Fiorino noticed that Oliver had a white substance in his mouth, which he told her was aspirin. FD at 112.

Seconds after Fiorino had requested back-up, Officer David Burk ("Burk") arrived on the scene. FD at 112. Burk parked his car so that it, along with Fiorino's car, was boxing in the turning lane where the incident was taking place. Burk Deposition ("BD") at 78. When Burk arrived, Oliver was standing several feet from Fiorino in the median, talking loudly and "moving his hands around." BD at 75.

After Fiorino told Burk what was going on, they considered taking Oliver into custody under Florida's Mental Health Act, Fla. Stat. § 394-463(1) ("the Baker Act"), because he appeared to be mentally unstable. Burk then approached Oliver and asked him for his name and identification. FD at 115, 136; BD at 79. Oliver complied by giving Burk his identification card. FD at 116, 136; BD at 79. Burk then waited for the light at the nearby intersection to turn red and tried to coax Oliver across the street to the sidewalk so that they could talk. FD at 138; BD at 81. Burk put his hand on Oliver's shoulder to guide him across the street, but Oliver stopped in the middle of the street and began to babble incoherently. BD at 83; FD at 138-39. When the light changed and traffic began to move again, Burk tried to force Oliver across the street but Oliver became agitated and pulled away from him. BD at 86; FD at 139.

Burk grabbed Oliver's shirt to try to get him out of the road, but Oliver resisted. BD at 87-88; FD at 139-40. Oliver was flailing his arms and trying to push Burk off of him, but Burk kept holding on to his shirt. FD at 140-41. Approximately 30 seconds after Burk arrived on the scene, Fiorino says she saw Oliver try to push Burk away so she fired her Taser at Oliver for the first

time.⁴ FD at 129-30, 132-33, 141. The taser prongs hit Oliver in his abdomen and he fell to the ground. Fiorino then called in to report the use of force to her sergeant. FD at 132-33.

Fiorino stated that she continued to tase Oliver because he would not stay on the ground.⁵ After the third or fourth tase, one of the taser wires became disconnected from the taser prong. FD at 150, 192; BD at 97, 190. Fiorino then loaded a second cartridge into her taser and began tasing Oliver again. FD at 150. Fiorino said she was not sure how many times she tased Oliver⁶, but that she just kept pulling the trigger until he stayed on the ground. FD at 155. Fiorino stated that the last time she tased Oliver, he was lying on his back in the middle of the road. FD at 159-60.

Carl Hughley and Richandra Nelson, who witnessed the incident, stated that after the first tase Oliver was on the ground and never got back up. (Doc. 193-8, 193-2 at 1).⁷ Hughley stated that Oliver was lying on the ground screaming that it was "too hot" and trying to get up, but was not able to. (Doc. 193-8 at 5). Nelson stated that Oliver remained on the ground until the other Officers arrived, while Burk just stood there and watched Fiorino tase him. (Doc. 193-2 at 2). Both Nelson and Hughley witnessed Oliver attempting to get up from the ground, but said that they never saw him struggling with Burk. (Doc. 193-2 at 6). Nelson stated that she did not see Burk try

---

⁴It seems virtually impossible for all of these events to have occurred within thirty seconds of Burk's arrival.

⁵Neither Fiorino nor Burk testified that they ever told Oliver to stay on the ground.

⁶The Taser Log shows that Fiorino fired eight times over a period of two minutes and nine seconds. (Doc. 143-13 at 6). However, on the day of the incident Fiorino believed she had fired eleven or twelve times. FD at 166.

⁷Plaintiff's exhibit filed at Doc. 193-2 was stricken from the public view because it contained personal information about a witness. Plaintiff has been give leave to re-file a redacted version of this exhibit, however, for purposes of this Order the Court will cite to the original document number.

to handcuff Oliver until after the other officers arrived at approximately 3:24 p.m. (Doc. 193-2 at 2, 5, 6); FD at 131.[8]

Fiorino stated that after Oliver was handcuffed, foam was coming out of his mouth and that it looked like Oliver's body was going limp, but he was still screaming. FD at 174, 187-88. After Burk walked Oliver back to the median, Fiorino took some of the taser prongs out of his body but was unable to remove them all. BD at 108; FD at 182.

At 3:35 p.m. EMT Carly Bishop ("Bishop") and her partner, paramedic Rudy Smith ("Smith") arrived on the scene. Oliver was handcuffed and sitting on the median, awake but not talking. Carly Bishop Deposition ("CBD") at 10, 36, 43.  After Oliver was placed on the stretcher, Burk noticed that Oliver had blood in his mouth. BD at 121. As Oliver was being put in the ambulance, he sat straight up, looked at Bishop and began to have a seizure. CBD at 14. After Oliver was put in the ambulance his health began to deteriorate rapidly and his temperature was 107 degrees. BD at 144; CBD at 39. Oliver was pronounced dead on June 1, 2004 at Florida Hospital. (Doc. 30 at 5).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. .*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the

---

[8]When the other officers arrived at the scene, Burk told Oliver to roll over on his belly and then proceeded to handcuff him. FD at 158-60. Burk then rolled Oliver onto his side, searched his pockets, and tried to sit him up, but Oliver kept trying to lie back down. FD at 173.

burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis,* 451 F.3d at 763 (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

**III. Legal Analysis**

*A) 42 U.S.C. § 1983 ("§ 1983")[9]*

The Plaintiff alleges that the City is liable under § 1983 for violations of Oliver's Fourth Amendment rights. In order to establish municipal liability under § 1983, Plaintiff must first establish that one or more of Oliver's constitutional rights were violated. *McDonnell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 1987). This Court has already ruled that the facts of this case viewed in the light most favorable to the Plaintiff demonstrate a violation of Oliver's constitutional rights through the use of excessive force. (*See* this Court's Order, dated August 20, 2008, filed at Doc. 215) Therefore, the Court incorporates by reference its previous discussion of those issues.

The City correctly asserts that the doctrine of *respondeat superior* does not apply to claims arising under § 1983. *Engelleiter v. Brevard County Sheriff's Dept.,* 290 F. Supp. 2d 1300, 1308 (M.D. Fla.). Instead, municipal liability under § 1983 may be established by evidence that:

> (1) the constitutional deprivation was caused by a policy or custom of the local governmental entity, *or* (2), the final policymakers of the local governmental entity acted with deliberate indifference to a constitutional deprivation, *or* (3) the final policymakers of the local governmental entity delegated their authority to a subordinate who, in turn, caused a constitutional deprivation, *or* (4) the final policymakers of the local governmental entity ratified a constitutionally impermissible decision or recommendation of a subordinate employee.

*Sherrod v. Palm Beach County School District,* 424 F. Supp. 2d 1341, 1344 (S.D.Fla. 2006) (emphasis added).

---

[9]Plaintiff has inartfully pled § 1983 violations by the City in two counts. This is superfluous, thus Counts II and IV will be treated as a single Count.

Plaintiff has presented two theories of liability with regard to her § 1983 claims: (1) that the City failed to properly train its officers and (2) that the City had a custom or policy of using excessive force. (*See* Doc. 195 at 17).

### 1. Custom or Policy

A municipal policy or custom is "a persistent and wide-spread practice." *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994). Plaintiff must establish, not only that the policy or custom existed but also that "actual or constructive knowledge of such custom" is attributable to city officials. *Id.* Therefore, "random acts or isolated incidents" are generally not enough to establish municipal liability. *Id.*

Plaintiff argues that the City had a policy of using excessive force because it employed a use of force matrix that permitted its officers to use tasers in response to "passive resistance" by an individual.[10] Plaintiff's expert witness, William Gaut, has testified that tasers should only be used against individuals who are "actively resisting." Gaut testified, based on materials dating back to the year 2000, that the City's policy was not in line with generally accepted police practices. (Docs. 148-4 at 1-2 and 148-5 at 22). Thus, Plaintiff has presented evidence that the City should have known, prior to this incident, that its use of force matrix permitted the use of excessive force against individuals who were passively resisting.

Furthermore, Gaut testified that Oliver was passively resisting prior to being tased. (Doc. 148-12 at 4). Therefore, based on the evidence presented by Plaintiff, a jury could conclude that

---

[10]There is no question that the City created, and thus was aware of, this policy.

the City had a policy of using excessive force and that this policy led to the violation of Oliver's constitutional rights.

### 2. Failure to Properly Train

It is well established that inadequate training can, in limited circumstances, provide the basis for municipal liability under § 1983. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 407 (1997) (hereinafter "*Bryan County*"). However, Plaintiffs must show that the municipality acted with deliberate indifference to the known or obvious consequence of its actions. *Id*. Plaintiffs who attempt to establish liability for failure to train, must show that the training program was inadequate, and not simply that it was administered poorly. *See id.* Municipalities may also be held liable for a failure to train if the need for training is obvious and the lack thereof is likely to result in violations of constitutional rights. *City of Canton v. Harris,* 489 U.S. 378, 390 (1989).

Here, it is undisputed that the City trained its officers, in accordance with the policy discussed above, to use tasers against individuals who were passively resisting. It is only logical that training officers in accordance with an unconstitutional policy is unconstitutional as well. Furthermore, it should have been obvious to the City that training officers to use this excessive force against passively resistant individuals would result in constitutional violations. Thus, the City is not entitled to summary judgment on Plaintiff's § 1983 claim.[11]

---

[11]Plaintiff's complaint also alleges that the City "failed to properly train [its] officers to identify persons who may be afflicted by mental defect, and to properly take actions to deescalate (*sic*) potentially volatile encounters with persons in the public." (Doc. 30 at 7). However, Plaintiff has presented no evidence to support these allegations.

*B) Count III: The Wrongful Death Act*

The City argues that it is entitled to summary judgment on Count III because it is a "regurgitation" of the § 1983 claim for failure to train. This argument is has no merit. A claim under Florida's wrongful death act is entirely different than a claim under § 1983. Thus, Defendant is not entitled to summary judgment on Count III.

## IV. Conclusion

For the reasons stated herein, it is

**ORDERED** that The City of Orlando's Motion for Summary Judgment (Doc. 139) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 22, 2008.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party