# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

AMY SHIRLEY OLIVER, as Personal
Representative of the Estate of Anthony
Carl Oliver, Sr., deceased, for and on behalf
of the survivors of the Estate of Anthony
Carl Oliver, Sr.,

**Plaintiff,**

-vs-                                               Case No.  6:06-cv-1671-Orl-28DAB

CITY OF ORLANDO; LORI FIORINO,
Orlando Police Department Officer; DAVID
BURK, Orlando Police Department Officer;
and TASER INTERNATIONAL, INC.,
                              **Defendants.**

_____

# ORDER

This case arises out of the death of  Carl Anthony Oliver ("Oliver").  Plaintiff Amy

Shirley Oliver ("Plaintiff"), as personal representative of  Oliver's estate, has sued the City of

Orlando ("the City"), Orlando Police Department Officers Lori Fiorino ("Fiorino") and David

Burk ("Burk"), and Taser International, Inc. ("Taser") (collectively "Defendants").[1]  Plaintiff

alleges several constitutional violations pursuant to 42 U.S.C. § 1983, wrongful death pursuant

to sections 768.16–768.27, Florida Statutes, and several products liability claims.[2]  Defendants

---

[1] Defendants Orlando Police Department and Chief Michael McCoy were previously
dismissed.  (Docs. 62 & 73).

[2] Specifically, Plaintiff alleges a § 1983 claim of excessive in violation of the Fourth and
Fourteenth Amendments against Fiorino and Burk (Count I); § 1983 claims of failure to train and of
a policy of using excessive force in violation of the Fourth and Fourteenth Amendments against the

now seek to exclude the opinion testimony of Plaintiff's expert, Dr. Glenn Rudner ("Dr. Rudner"), and argue that they are entitled to summary judgment.[3]  As discussed below, the methodology used by Dr. Rudner to reach his opinions is conclusory and unreliable, and therefore, his opinion testimony will be excluded.   Furthermore, without Dr. Rudner's testimony, Plaintiff has failed to present any evidence of causation, and Defendants' motions for summary judgment consequently must be granted.

## Background

At approximately 3:00 p.m. on May 31, 2004, Fiorino encountered  Oliver on State Road 50 in Orlando, Florida.  (Doc. 281-6 at 98-99).  While she was driving at approximately thirty-five to forty miles per hour, Fiorino observed Oliver walking from the median toward her car waving his arms (*Id.* at 99-100).  After Fiorino stopped, Oliver approached her vehicle and began banging on the windows and attempting to open the doors.  (*Id.* at 101).  With her loudspeaker, Fiorino ordered Oliver to step away from the vehicle; he complied.  (*Id.* at 103-04).  Fiorino then exited her vehicle and Oliver exclaimed: "They're shooting at me, they're shooting at me" while pointing in the general direction of a car dealership.  (*Id.* at 105).  In

---

City (Counts II and IV); a wrongful death claim pursuant to sections 768.16–768.27, Florida Statutes, against the City, Burk, and Fiorino (Count III); and claims of negligent failure to warn, negligent manufacture, assembly, or distribution, strict liability design defect, and strict liability manufacturing defect against Taser (Counts V, VI, VII, and VIII).

[3]This case is now before the Court on the Renewed Motion to Exclude Expert Opinion Testimony of Dr. Glenn Rudner (Doc. 275) filed by the City, Fiorino, and Burk; the Second Motion to Exclude Expert Opinions and Testimony of Dr. Glenn Rudner (Doc. 277) filed by Taser; the Third Motion for Summary Judgment (Doc. 276) filed by Taser; the Renewed Motion for Summary Judgment (Doc. 278) filed by the City; the Renewed Motion for Summary Judgment (Doc. 279) filed by Fiorino; and the Renewed Motion for Summary Judgment (Doc. 280) filed by Burk.  Plaintiff failed to timely respond to any of these motions.

response, Fiorino attempted to gather more information from Oliver and called for backup, (*id.* at 110-111); approximately one minute later, Burk arrived on the scene, (*id.* at 112). Burk attempted to escort Oliver toward the sidewalk and out of traffic, but Oliver resisted Burk's efforts and held Burk in the street with him. (*Id.* at 141-143; Doc. 281-1 at 87-88). At that time, Fiorino deployed her department-issued Taser M26 Electronic Control Device ("taser"), discharging a five-second electrical pulse into Oliver eight times over the course of two minutes and eight seconds. (Doc. 319 at 4-5). With the assistance of several other officers who had arrived, Burk managed to get Oliver out of traffic and handcuffed. (Doc. 281-1 at 107-08; Doc. 281-6 at 168-69).

Paramedics arrived at approximately 3:35 p.m., and at that time Oliver was sitting up and able to breathe and move on his own. (Doc. 319 at 5; Doc. 281-15 at 11-12). However, when Oliver was placed on a stretcher in the ambulance, he began having a seizure. (Doc. 319 at 5; Doc. 281-15 at 14). While in transport to Florida Hospital, Oliver developed pulseless electrical activity, meaning that the heart monitor showed an electrical rhythm but Oliver did not have a detectable pulse. (Doc. 281-9 at 10; Doc. 281-16 at 6). By the time he arrived at Florida Hospital, Oliver had a body temperature of 108 degrees Fahrenheit. (Doc. 281-9 at 14). The emergency room physician, Dr. DePonte, was concerned that Oliver was in acute cocaine intoxication and that he was suffering from severe hyperthermia, cardiopulmonary arrest, rhabdomyolysis,[4] and multi-organ failure. (*Id.* at 15, 26, 43). Toxicology screens performed

---

[4] Rhabdomyolysis is "a breakdown of [a person's] muscles" that "release[s] electrolytes into [the] blood" and "can be fatal." (Doc. 281-9 at 24-25).

after Oliver's arrival at the hospital confirmed the presence of parent cocaine in his urine and cocaine metabolites in his blood.  (Doc. 281-11 at 14).

At 7:53 p.m., Dr. Rodricks, the intensive care unit doctor on duty, examined Oliver and determined that he was in "extremis," which means that Oliver was "[d]ead or nearly dead with essentially no chance of survival."  (Doc. 281-13 at 8-11).  Oliver's life support was removed the next day.  The Deputy Chief Medical Examiner conducted an autopsy and concluded that the cause of death was cocaine-excited delirium.  (Doc. 281-10 at 83; Doc. 281-11 at 10).

### Motion to Exclude

Plaintiff's expert, Dr. Rudner, was deposed on April 26, 2008 and was redeposed on January 5, 2011 for the purposes of updating his deposition.  Defendants now move to exclude Dr. Rudner's expert testimony.[5]

## I.  Legal Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It allows an expert to testify in a case, provided that "scientific, technical, or other specialized

---

[5]This issue has been addressed previously.  This case was originally assigned to another judge in this district, Judge Presnell, who summarily denied Defendants' motions to exclude Dr. Rudner in a one-line opinion.  (Doc. 214).  Judge Presnell stated that the parties' objections went to weight and credibility, not admissibility.  Subsequently, Judge Presnell entered an order of recusal and the case was assigned to me.

Thereafter, the Second Amended Case Management Order extended the discovery deadlines. Defendants have filed new motions that present arguments not previously addressed, and the second deposition of Dr. Rudner (taken January 5, 2011) constitutes new evidence that must be considered. (Doc. 275-21).

knowledge will assist the trier of fact." Fed. R. Evid. 702.  Additionally, the expert must be qualified by "knowledge, skill, experience, training, or education" and may testify to an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Id.*

Rule 702 compels courts to perform a "gatekeeping" function–specifically, to determine whether the proffered expert testimony is reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7, 590-91 (1993).  The Eleventh Circuit has highlighted the importance of *Daubert*'s gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  The Eleventh Circuit requires "a rigorous three-part inquiry."  *Id.* In order for expert testimony to be admissible, a district court must determine that

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).

The burden of laying the proper foundation for the admission of expert testimony rests with the party offering the expert.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  The admissibility of the expert must be established by a preponderance of the evidence.  *Id.*

-5-

## II.  Analysis

### A.  Dr. Rudner's Opinion

Dr. Rudner's expert report, dated March 10, 2008, reviews the circumstances of Oliver's death and lists the autopsy findings.  (Doc. 159-3 at 1).  It states: "It is my opinion that the Taser weapon utilized on Anthony Carl Oliver, Sr. contributed to his death.  Additionally, it is my opinion that Tasers do provide an anatomic and physiologic substrate for clinical demise."  (*Id.* at 2).  Dr. Rudner's report explains that this opinion is made "to a reasonable degree of medical certainty" and is based upon "my training, education and experience."  (*Id.*).  Dr. Rudner also filed a Supplemental Report dated March 20, 2008 that details his experience as a testifying witness.  (Doc. 275-1 at 2).

### B.  *Daubert* and Rule 702 Requirements

Defendants contend that Dr. Rudner should not be permitted to testify based upon *Daubert* and the requirements of Rule 702.  Defendants claim that Dr. Rudner's opinions fail to meet the standard required by *Daubert*.  Specifically, they argue that Dr. Rudner is unqualified to testify regarding tasers, their effects on the human body, or the effects of electricity on the human body.  (Doc. 275 at 9-11; Doc. 277 at 12).  They also assert that Dr. Rudner used a flawed methodology, and that Dr. Rudner's opinions are not reliable and are unsubstantiated.  (Doc. 275 at 12-13; Doc. 277 at 14-15).

Plaintiff failed to respond to Defendants' motions in a timely fashion.  Nevertheless, Dr. Rudner is tendered as an expert witness in this case.  The Court has reviewed Dr. Rudner's deposition, expert report, second expert report, and second deposition in order to determine if

Dr. Rudner's expert testimony meets the requirements set forth by *Daubert* and Rule 702 by a preponderance of the evidence.  Defendants' motions will not be granted as unopposed; instead the Court will address the motions and the merits, taking up each argument in turn.

### 1.  Whether Dr. Rudner is Qualified to Testify Competently

Defendants assert that Dr. Rudner is not qualified to testify regarding the effects of a taser on a human being or the cause of Oliver's death.  (Doc. 275 at 17; Doc. 277 at 12-14).  They point to Dr. Rudner's deposition to argue that he does not possess sufficient knowledge of tasers, the effects of electricity on the human body, or the physiological interaction between tasers and the human body to testify competently on these matters.

Dr. Rudner is a board-certified forensic and anatomic pathologist who completed his residence in anatomic pathology, has held multiple fellowships in forensic pathology, and has published articles on forensic pathology.  (Doc. 159-3 at 3-5).  In his capacity as a forensic pathologist, Dr. Rudner has testified in numerous cases.  Forensic pathology is the study and application of medical knowledge to criminal issues, and it is often used to determine a decedent's cause of death.  *See* Delonix et al., *Forensic Pathology: Principles and Practice*, xxiii (2005) ("The determination of the cause and manner of sudden, unexpected, and violent deaths represents the practice of a distinct and recognized medical specialty called forensic pathology.").  Given that Dr. Rudner is a board-certified anatomic and forensic pathologist, he is qualified to testify competently on causes of death.

Even so, accepting Dr. Rudner's qualification to testify competently does not guarantee that his testimony is admissible.  *Daubert* and Rule 702 require that courts apply their

gatekeeping function to each expert to determine if the testimony is scientifically valid and whether the reasoning or methodology can be applied to the facts at issue. *Daubert*, 509 U.S. at 592.

### 2.  Whether Dr. Rudner's Methodology is Sufficiently Reliable

"District courts 'have substantial discretion in deciding how to test an expert's reliability.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (quoting *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)). Defendants, throughout their motions, point to what they see as numerous lapses in Dr. Rudner's methodology. They assert (as discussed previously) that Dr. Rudner lacks sufficient knowledge of tasers, their operation, and their effects on the human body such that he cannot testify competently. The City, Fiorino, and Burk point out that Dr. Rudner did not examine Oliver's body–though he did review the autopsy report–and add that Dr. Rudner has neither conducted research to support his opinion nor can he point to research that supports his opinion. (Doc. 275 at 12-13). Taser argues that Dr. Rudner "is not a cardiologist, an electrophysiologist, an emergency room physician, or an electrical engineer." (Doc. 277 at 7). Taser suggests that Dr. Rudner's methodology is flawed because he failed to review Oliver's prior medical records, (Doc. 275 at 14), and points to the same lack of studies as the other Defendants, (Doc. 275 at 9-10). Finally, Taser states that Dr. Rudner's theories have not been subjected to peer review, are not generally accepted in the relevant scientific community, and do not exclude other potential causes of death. (Doc. 275 at 16-19).

Courts have consistently utilized four guideposts set out by *Daubert*'s reliability prong. They include, but are not limited to, (1) whether the expert's methods have been tested or could be tested; (2) whether the expert's technique has been subjected to peer review and publication; (3) the error rate of the methodology; and (4) whether the technique is generally accepted in the proper scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593-94). "These factors are illustrative, not exhaustive, and a court should 'consider any additional factors that may advance its Rule 702 analysis.'" *Gilliam ex rel. Waldroup v. City of Prattville*, 667 F. Supp. 2d 1276, 1295 (M.D. Ala. 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)), *rev'd in part on other grounds*, No. 10-10670, 2011 WL 1544818, at *1-7 (11th Cir. Apr. 26, 2011). Importantly, the focus is on the expert's principles and methodology, not the conclusions he reaches. *McDowell*, 392 F.3d at 1298.

Dr. Rudner was retained by Plaintiff to render an opinion on the cause of Oliver's death. He reviewed the autopsy report and death certificate before filing his first expert report. (Doc. 159-7 at 39). Dr. Rudner admitted that he did not review Oliver's past medical records. (Doc. 159-7 at 12). In his deposition, Dr. Rudner stated, "[i]n my opinion, Mr. Oliver died as a result of ventricular dysrhythmia in conjunction with rhabdomyolysis." (Doc. 159-7 at 2). Dr. Rudner added, "the cause of death was complication due to electrocution by TASER and a cocaine intoxication, in that order." (*Id.* at 3).

### i. Methodology

Dr. Rudner's deposition centered upon the methodology he employed in reaching his opinions.  When asked how a taser affects an individual's cardiac threshold potential, Dr. Rudner replied, "I think that's a question best addressed by an electrophysiologist." (Doc. 159-7 at 10).  And, when questioned further on how a taser might put someone into ventricular fibrillation, Dr. Rudner stated, "I'm sure there are probably other more detailed mechanisms that an electrophysiologist could answer, but I'm not an electrophysiologist.  It's my opinion that taser[s] can cause cardiac dysrhythmias.  The exact molecular basis for such, I can't further address it."  (*Id.*).

When asked about the depth of his expertise, Dr. Rudner explained that he is an expert in causes of death, not tasers.  (*Id.* at 18).  Nevertheless, Dr. Rudner stated that Oliver's rhabdomyolysis was, in his opinion, caused by the taser.  (*Id.* at 37).  When asked about the degree of muscle contraction (a potential cause of rhabdomyolysis) that is produced by a taser, however, Dr. Rudner responded, "I don't know."  (*Id.*).  When pressed, Dr. Rudner offered, "If a taser was involved, I'm making a determination of the death based upon my training and expertise.  That's it."  (*Id.* at 18).

### ii. Publications

When questioned about the literature he relied upon in forming his opinion, Dr. Rudner could not point to any specific scholarly articles.  Rather, Dr. Rudner referred to "[t]he general body of scientific and forensic literature."  (*Id.* at 37).  When asked whether he would point to any specific literature that comes to the same conclusions he drew, Dr. Rudner replied, "[n]ot as this time."  (*Id.*).  Counsel further pressed Dr. Rudner to point to *any* literature that discusses

-10-

or finds that a taser is capable of causing rhabdomyolysis. He answered, "I think this case is a good example of that." (*Id.*). He did not provide any citations.

Counsel also questioned Dr. Rudner about whether he knew of any texts in which a taser was attributed as a cause of death. Dr. Rudner stated, "Well, you know, I haven't–you know, I don't read every forensic journal out there or every medical journal out there . . . ." (*Id.* at 41). In fact, the only scholarly literature that was discussed in depth over the course of Dr. Rudner's two lengthy depositions was an article published in the *New England Journal of Medicine*. (*Id.* at 9, 41). Dr. Rudner did not remember specific details, but he described the article as a case study of one individual. (*Id.* at 9, 41). The Eleventh Circuit has stated that case studies are not reliable scientific literature. *Kilpatrick v. Berg, Inc.*, 613 F.3d 1329, 1339 (11th Cir. 2010) (finding case study unreliable because it did not contain statistical analysis and did not draw medically valid conclusions).

Dr. Rudner produced a copy of the article at his second deposition; the "article" is a two-page letter to the editor that describes an incident where an adolescent was struck with a taser. (Doc. 275-21 at 31; Doc. 136-2). While the adolescent did suffer ventricular fibrillation, he made "a nearly complete recovery." (Doc. 136-2 at 1). The letter's purpose was to suggest that providing law enforcement officers with defibrillators "should be considered." (*Id.*).

### iii. Scholarly Contributions and Peer Review

Dr. Rudner was also asked what publications he has contributed to the field of scientific literature. Dr. Rudner stated that he has not given any presentations on deaths caused by tasers

or deaths that occurred while in law enforcement custody. (Doc. 159-7 at 38). Moreover, Dr. Rudner admitted that he had never authored anything on arrest-related death or electronic control devices. (*Id.*). Indeed, Dr. Rudner's only suggestion was for counsel to look at his curriculum vitae. None of Dr. Rudner's publications, on their face, appear to discuss pulseless electrical activity ("PEA"), electro-cardiac issues, tasers, ventricular fibrillation, cocaine-induced delirium, or any other topics at issue in this case.

When asked if he had shared his opinions on tasers causing PEA with other pathologists, Dr. Rudner said he had not. (Doc. 159-7 at 44). Dr. Rudner also could not list any pathologists who are of the opinion that tasers can induce cardiac arrhythmia. (*Id.*). He admitted that he could not point to a single scientific study showing that a taser could cause PEA. (*Id.*).

### iv. Scientific Studies

Dr. Rudner explained that it is difficult to test how tasers affect human beings. (Doc. 159-7 at 37). Indeed, it is neither ethical nor legal for scientists to tase cocaine-users or non-users in order to observe the rates of PEA and ventricular fibrillation. This makes reliance on animal testing, case studies, and scholarly literature all the more important. *See Kilpatrick*, 613 F.3d at 1337 n.9 ("[I]n the absence of such studies, the nature of the other evidence (case reports, animal studies, in vitro studies) becomes that much more important, and the court's consideration of such evidence and the methodologies used must be that much more searching."). Yet, when asked if he had conducted any clinical research into the effects of tasers on animals, Dr. Rudner said no. (Doc. 159-7 at 42). He admitted he would not even know how to conduct such a study. (*Id.* at 43).

-12-

### v. Ability to Rule out Other Causes

Courts evaluating the reliability of an expert's testimony may also consider whether the expert has adequately accounted for obvious alternative explanations.  Fed. R. Evid. 702 advisory committee's note (2000); *see also Claar v. Burlington N. R.R.*, 29 F.3d 499, 503-04 (9th Cir. 1994) (holding district court properly excluded testimony where expert failed to consider other obvious causes of plaintiff's condition).  Here, there is direct evidence that Oliver had cocaine in his system on the day he was tased.  In fact, Dr. Garavagia, who filled out Oliver's death certificate, listed the cause of death as cocaine-excited delirium.  (Doc. 281-10 at 83; Doc. 281-11 at 10-11).

When asked if anything other than the tasing could have caused Oliver's ventricular dysrhythmia, Dr. Rudner explained, "I think it's possible that cocaine may have been contributory" in Oliver's death.  (Doc. 159-7 at 3).  However, he did not describe how or to what extent cocaine may have been contributory.  Instead, he said it was "more likely" that the taser "was contributory" to Oliver's death.  (*Id.*).

Counsel pursued the cocaine issue with Dr. Rudner, asking if he was aware of studies that show cocaine abuse can cause hyperthermia in human beings and studies showing that cocaine abuse can cause rhabdomyolysis in human beings.  Dr. Rudner said he was aware of such studies.  (*Id.* at 43).  He also agreed that hyperthermia due to cocaine abuse can be a significant factor in causing rhabdomyolysis.  (*Id.*).  But, when asked if cocaine would just as likely be the cause of Oliver's death, Dr. Rudner replied "No. No. . . . the point is, he was doing fine until he was struck by the taser."  (*Id.*)

### vi.  Dr. Rudner's Testimony is Not Sufficiently Reliable

The Court is concerned by the lack of explanation of Dr. Rudner's logic and methodology.  Dr. Rudner's expert reports do not state the basis for his opinions.  Instead, Dr. Rudner claims to have relied simply upon his "training, education, and professional experience."  (Doc. 137-2 at 2; Doc. 275-1 at 2).  While Dr. Rudner's education and experience establish him as a qualified pathologist, they do not explain the methodology for his expert opinion.  Dr. Rudner's deposition testimony is equally uninformative.

When asked, Dr. Rudner could not point to any research he had conducted to bolster his opinions.  The publications listed on his curriculum vitae are unenlightening.  Moreover, Dr. Rudner failed to describe any studies or publications that support his opinion.  In fact, he could not point to any peer-reviewed research that supports his conclusions.  The only publication discussed was a two-page letter to the editor that fails to exhibit any scientific standards.

Additionally, Dr. Rudner did not demonstrate that he considered and excluded alternative explanations for Oliver's death–specifically, Oliver's cocaine usage.  In fact, Dr. Rudner seemed to ignore the cocaine usage altogether.  Instead, Dr. Rudner appeared to focus on the temporal proximity between when Oliver was tased and his time of death.  The following section from his deposition is illustrative:

> Q      Is there anything that took place, to your knowledge, that occurred or happened that are relevant to your opinions?
>
> A      Yes . . . . He was alive, he was tasered, he died.

(Doc. 159-7 at 14).

Courts in this circuit have excluded experts in tasing cases for following the same logical fallacy. A district court in the Middle District of Alabama considered the testimony of a forensic pathologist in a case where the decedent died after being tased. *Gilliam ex rel. Waldroup*, 667 F. Supp. 2d at 1295. The court held that the pathologist's methodology was flawed because the only rationale for his opinion was based upon the proximity of the tasing to the decedent's death. *Id.* at 1296. The court excluded the opinion because it relied on flawed logic, failed to consider the decedent's drug use, and ignored preexisting conditions. *Id.*

Similarly, the Eleventh Circuit has upheld a district court's exclusion of an expert witness in another case involving a taser. *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708 (11th Cir. 2008). The *Wilson* court stated that the expert did not show that his opinion about tasers was testable, he "did not offer any error rate for his opinion," "he did not show evidence that his opinion has been peer reviewed or that he used a peer reviewed source," and he failed to show the general acceptance of his opinion. *Id.* at 714. The Eleventh Circuit added that the expert did not show he had ruled out other possible causes of injury. *Id.*

*Gilliam* and *Wilson* help to enumerate the specific scientific standards that courts have applied to experts in similar taser-related cases–standards that Dr. Rudner fails to meet. Furthermore, it appears that Dr. Rudner's opinion devolved into conclusory summation. For instance:

Q      Do you have any scientific evidence to support your theory that a taser
       is not safe for application to a person with a diseased myocardium?

A      Yes.

-15-

Q       And what scientific evidence can you point us to support that statement,
        sir?

A       Mr. Oliver.

(Doc. 159-7 at 44). Without articulated scientific methodology and confirmation of its

reliability, there is simply no justification to admit Dr. Rudner's expert testimony. *See Dishman*

*v. Wise*, No. 7:08-cv-45, 2009 WL 1938968, at *3 (M.D. Ga. July 7, 2009) (holding that

expert's opinion testimony was not reliable under *Daubert* because expert could not show that

her opinion was testable, did not offer any error rate for her opinion, did not show evidence of

peer review of her opinion, and did not show general acceptance of her opinion).  The Eleventh

Circuit has ruled that an expert who bases his opinion on unreliable literature and a mere

temporal relationship between incident and injury has not demonstrated reliable methodology.

*Kilpatrick*, 613 F.3d at 1341-42 ("Such specific causation testimony [based upon a temporal

relationship] has been found to be inherently unreliable in this Circuit.")  "Proving a temporal

relationship does not establish a causal relationship." *Id.* (quoting *McClain v. Metabolife Int'l,*

*Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005)).  After examining the evidence in this case, it is

clear that Dr. Rudner's opinion is founded solely upon the fact that  Oliver was tased on the day

of his injuries.  This is not a reliable methodology under *Daubert* and Rule 702.

### 3.  Whether Dr. Rudner's Testimony Assists the Trier of Fact

Given that Dr. Rudner's testimony is unreliable, it cannot assist the trier of fact.  It

cannot meet the requirements dictated by *Daubert* and its progeny, and therefore it cannot be

admitted.  *See Allison*, 184 F.3d at 1311-12 ("The judge's role is to keep unreliable and

irrelevant information from the jury because of its inability to assist in the factual determinations, its potential to create confusion, and its lack of probative value.").

**III.  Conclusion**

Dr. Rudner repeatedly refers to his training and experience, but he does little to clarify the methodology employed in reaching his present opinions.  The Court cannot allow Dr. Rudner to conclude that the taser caused Oliver's death simply because he says it did.  In order to reach a jury, Dr. Rudner's methods must be relevant and reliable.  Yet, there is little in the record to show that Dr. Rudner's opinion is such.

Dr. Rudner could not explain his methodology in his deposition. He could not point to any peer-reviewed publications, authored by himself or anyone else, that support his conclusions, nor could he discuss any studies supporting his conclusions.  Dr. Rudner did not offer any explanation of how his views are accepted in the scientific community, and his expert reports do not provide any explanations of his methods.

In sum, Dr. Rudner's opinions appear to be conclusory summations.  There is simply not enough information in the record to show that the methodology Dr. Rudner used to arrive at his opinions is reliable.  Without more, Dr. Rudner's testimony does not meet the requirements set out by *Daubert* and Rule 702.  Thus, he cannot be permitted to render an opinion in this case.

## Summary Judgment

Plaintiff asserts eight counts against the four remaining Defendants in this case.  (*See* Doc. 30).  Each of the claims requires proof that the taser caused Oliver's death.  Defendants

-17-

argue that without Dr. Rudner's testimony, there is no evidence of causation in the record. Defendants, therefore, assert that they are entitled to summary judgment. As discussed below, Defendants' motions for summary judgment (Docs. 276, 278, 279, & 280) must be granted.

## I. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). However, the failure to respond and create a factual dispute by the nonmoving party "does not automatically authorize the entry of summary judgment for the moving party." *Dixie Stevedores, Inc. v. Marinic Maritime, Ltd.*, 778 F.2d 670, 673 (11th Cir. 1985). "Rule 56 requires the moving party to demonstrate the absence of a genuine issue of fact." *Id.*

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## II. Analysis

In cases where a plaintiff asserts harm caused by a device, the plaintiff bears the burden of proving "both general causation–that the device in question can cause harm of the type [alleged]–and proof of specific causation–that the device in fact did cause [the alleged] injury." *Kilpatrick*, 613 F.3d at 1334 n.4. "To meet this burden requires the use of expert testimony." *Id.* "Florida courts follow the more likely than not standard of causation." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). In other words:

> Under Florida law, a plaintiff [] "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

*Guinn v. Astrazeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting *Gooding*, 445 So. 2d at 1018).

The evidence in the record does not support a finding that the taser was capable of causing Oliver's death, and therefore, Plaintiff has failed to establish general causation. However, even if Plaintiff had established general causation, the evidence does not afford a reasonable basis for the conclusion that the taser was more likely than not a substantial factor in bringing about Oliver's death.

On the contrary, the evidence indicates that, at most, the taser may have exacerbated Oliver's cocaine-induced delirium; it does not indicate that the taser itself caused Oliver's death. (*see* Doc. 281-10 at 83, 93, 102 (statements by Dr. Garavaglia, the medical examiner

who performed the autopsy on Oliver, that the official cause of death was "cocaine-excited delirium"; that "[c]ocaine in and of itself can cause cardiac arrhythmia because of the stimulant effect" but that it may be exacerbated by a physical struggle; and that "there is a very good chance with a core temperature of 108 that [Oliver] would have . . . died [without police intervention]"); Doc. 281-13 at 20, 53 (statements by Dr. Rodericks, Oliver's treating intensive care physician, that "the leading candidate on my differential diagnosis [for the cause of Oliver's cardiac arrest] would be cocaine abuse . . . . I don't think it had anything at all to do with the taser activity"; and that "the cocaine had a more profound effect on causing rhabdomyolysis than taser activity"); Doc. 281-9 at 43 (statements by Dr. DuPonte, Oliver's treating emergency room physician, that "[m]y concern with Mr. Oliver [was] that he was in acute cocaine intoxication upon my time and evaluation"; and that "[Oliver's] pulse was electrical activity. This may well have been due to hyperkalemic arrest secondary to rhabdomyolysis on the basis of cocaine abuse and possibly taser activity"); Doc. 244-2 at 3 (statement by Dr. Ho, a "board-certified emergency medicine physician," that "[a]s of [the date of the incident in this matter] no peer-reviewed published scientific, electrical, engineering or medical literature had ever concluded that TASER ECDs could cause ventricular fibrillation, cardiac dysrhythmia or rhabdomyolysis in humans").

Because Plaintiff has failed to provide any evidence that the taser more likely than not caused Oliver's death, Defendants are entitled to summary judgment.

## **Conclusion**

For the foregoing reasons, it is **ORDERED** that Defendants City of Orlando, Lori Fiorino, and David Burk's Motion to Exclude (Doc. 275) and Defendant Taser International, Inc.'s Motion to Exclude (Doc. 277) are hereby **GRANTED**.  It is further **ORDERED** that Defendants' motions for summary judgment (Docs. 276, 278, 279, & 280) are **GRANTED**.  All other pending motions in this case are **DENIED as moot**.  The Clerk is directed to enter judgment in favor of Defendants City of Orlando, Lori Fiorino, David Burk, and Taser International, Inc. and close this case thereafter.

**DONE** and **ORDERED** in Orlando, Florida on this 31st day of May, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties